164128 Domenco Taglieri v. Michelle Monasky Arguments not to exceed 15 minutes per side. Mr. Baum for the appellant. Good morning and may it please the court. Christopher Baum on behalf of appellant Michelle Monasky. I'd like to reserve three minutes for rebuttal. The district court erred in two main respects. First, it erroneously held that Italy was AMT's habitual residence. Second, it erroneously held that AMT would not face a grave risk of harm if returned to Italy. Both errors independently warrant reversal. Turning first to habitual residence. Under Robert v. Tessin, the standard for determining a child's habitual residence in this circuit is the acclimatization standard. It is undisputed that Taglieri could not have met his burden under that standard because AMT was eight weeks old at the time she left Italy. So the question that I have is whether, with respect to an eight-week-old, is there no habitual residence then in most cases? Your Honor, I would not say in most cases. I would say that where there is a lack of shared intent, there is – either the petitioner cannot meet his burden to establish habitual residence or there is no habitual residence. But if there is a shared intent, then there can be a habitual residence. So then acclimatization isn't the be-all and end-all under Roberts or other precedent? It is not, Your Honor. In the cases involving young children, as this Court recognized in Tessin, acclimatization is the standard except with respect to either very young children or children that are developmentally disabled such that they lack cognizance of their surroundings. This is such a case. Then we go to shared intent and the judge had a, what, four-day trial, lengthy opinion, goes through a lot of facts, seems to reach a decision where he says there are things on both sides. So what did he do wrong? In this case, Your Honor, he made no finding of shared intent. Nor could he have given his other findings because in this case, the Court held that Manaske intended to leave with AMT as soon as possible after the birth and, in fact, that she did so as soon as possible. Moreover, the Court found that Manaske indicated to both Taglieri and to her family members, both before and after the birth, that she In other words, the district court made no shared intent finding and could not have. So then what did he rely on? The district court applied a, in essence, a presumption that based strictly on the fact that both parents resided in Italy at the time the child was born, Taglieri had presumptively met his burden. It then required Manaske, shifting the burden, to establish definitively that her marriage had broken down and that she had a definitive date on which she would leave. But she could not have had a definitive date on which she could leave because she could not know when her passport would be issued, just as the mother in Ovalle v. Perez. In other words, the district court did not assess all of the available evidence regarding Manaske's intent, including its own findings that she intended to leave with AMT as soon as possible, but rather applied the test that this court warned against applying in Tessin. So suppose that, hypothetically, that the mother's intent varies during the eight-week period that the child is living in Italy. What should a court do in that hypothetical? In cases where there is a shared intent between the parents, and that requires a meeting of the minds, as the court recognized in Berezauski v. Ojeda, while the child is residing and there's a shared intent, then that should be the child's habitual residence. But where there is a lack of shared intent from both before the child was born all the way up until the child left the country, there can be no habitual residence. Okay. So suppose, hypothetically, that the first month of the two-month period, the mother and father and child are living happily in Italy. But then suppose, hypothetically, at that point the father hits the mother and the mother says, I'm out of here, I want to leave, and I'm going to leave as soon as a passport is issued. And then she does leave with the child the day the passport is issued. What should we do with the acknowledged shared intent for that first month, and then the change in circumstances leading to a non-shared intent? Sure. Your Honor, that case is closer to Friedrich, where that was similar to the fact pattern there, except that the child there was 19 months old at the time. But an incident there precipitated the removal at 19 months, and the mother couldn't realize that she could no longer stay in Germany in that case. And in that case, there was deemed to be acclimatization, right? Because that was the first Court of Appeals decision interpreting habitual residents in the country, the Court had not yet established that acclimatization was a relevant factor. But going back to your question, that is not this case, because in this case, the evidence in the record that the District Court expressly credited as credible was that there was abuse on February 10th before AMT's birth, and that Manaske intended to leave as soon as possible, and that she communicated that intent even before the child was born. Counsel, I'm sorry. With respect to what the Court did here, at roughly pages 16 to 22 of the opinion, it seems to me that the Court fairly carefully goes through the party's intent. He uses that term at some points, but he talks about how they were some things on both sides. He says, based on all the evidence, it appears that at least until the March 31 incidents, when he raises his hand, though he doesn't strike her, that there was a marital home in Italy where they intended to remain. Doesn't that really meet Judge Moore's hypothetical? Or am I misreading that section? No, Your Honor. The Court was, in fact, looking at this marital home construct, as you say, in that it was looking to whether the parents had an indefinite intent to remain. But the test, instead, as elucidated by the five other circuits to have considered the issue, is whether there is a shared intent to raise the child in that country. And in this case, the District Court found that because Manaske had no date that she could point to on the calendar on which she would leave, that she could not have had – she did not have a settled plan to leave. But a plan is different than an intent. And so, for example, on 17, in the District Court opinion, he says on February 10th, Manaske indicated that she wanted to divorce and return to the U.S. And that was before the birth. Yes, Your Honor. And on March 1st and March 2nd, she reiterated her desire to divorce. But then on page 19, the District Court says she had no crystallized plan in place. And so the question that I would have then is, would there be a requirement anywhere that the parent who intended to leave have to have undertaken something that made a crystallized plan? Is the District Court getting that from somewhere? So, Your Honor, there is no such requirement. And in fact, on page 19, the same page as the crystallized plan language, the District Court expressly finds that Manaske intended to leave with AMT for the United States as soon as possible. And Manaske could not have had a crystallized plan, much like in most cases involving newborns, because she could not leave for the United States until she had AMT's United States passport. She could not have known when she would receive that passport. And thus, she could not have, for example, booked a flight. But the objective steps that she took to return with AMT to the United States, even from before the child was born, are clear. She sought employment in the United States. She sought health care and child care. She obtained moving quotes. She sought AMT's passport as soon as possible. And indeed, on the very day that she received AMT's passport, she left for the United States. Counsel, on page 19, because you are correct, there's a sentence that says these facts support a court's conclusion, which maybe it's the court, but a court's conclusion, that despite her intent to return to the US with AMT as soon as possible, and then within the very next paragraph, it ends, on the contrary, most of the steps Manaske took seem to reflect a settled purpose and intent to remain in Italy, at least for an undetermined period of time. So how do you reconcile that? Is the first sentence, in effect, subjunctive? Is he really saying, I find that this court's conclusion that she meant to leave as soon as possible? Because it seems to be, if you read it that strongly, it seems to be very contradictory to what's in the very next paragraph. Well, Your Honor, that is the way that we read the language, but it's not necessarily contradictory. The reason is that the district court was applying the wrong legal test, and it was asking the wrong question, which is, did she have a settled purpose or plan, in the language that you quoted, to remain indefinitely? But that is not the test. What is the test? The test is whether the parties shared an intent to raise the child in a So basically, then, you would say that, one, there wasn't a shared intent here as to where to raise the child, and two, because there wasn't a shared intent, then there can't be a habitual residence, right? Until the child is of age to have acclimatized. Let's just confine our discussion to infants to make it easier here. So essentially, the end result of that analysis, as I understand it from you, is then that the Hague protections don't extend, then, to infants. That's not correct, Your Honor, simply because it... Under the scenario that we're talking about here, the Hague protections don't apply, right? Correct, Your Honor. So we're... I understand the language that you derive from these other cases, none of which really involve infants. So where in the Hague Convention is there some suggestion that because two people go to a country, they establish residence, there seems to be no doubt they intended to go to Italy and live together, that because of marital dispute, therefore, as long as one parent snatches the infant, snatches a child while they're still an infant, that therefore, the Hague protections don't apply? Where do we derive that from the Hague Convention? Well, Your Honor, first I would... Or ICARA, for that matter. First I would dispute that the cases that we rely on from the five other circuits don't involve infants, because all five of them involve infants and a lack of shared intent, and it is dispositive in all five of those cases that the petitioner cannot meet his burden. But as for the Hague Convention's purpose, the purpose of the Hague Convention is to protect the status quo and to prevent a child from being removed from his family and the circumstances into which the child has developed. But where there are no such circumstances, the purposes of the Hague Convention do not apply. And the Hague Convention does not provide for return in all circumstances, and in fact, the return remedy is limited to very particular circumstances. And one of those requirements is habitual residence, and that is not simply that the child was born there, because if the birthplace is determinative, that opens up the child's birthplace to manipulation by one parent or the other, meaning that the form that which would frustrate the convention's forum shopping purposes. Now one point that I'd like to get to is that... But we've already said in Frederick that there isn't any real distinction between ordinary residence and habitual residence. There's no question that the ordinary residence of the mother and the child at the time of the birth and for a short time afterwards was Italy, right? If that were the case, Your Honor, then there would be no need for Tesson's acclimatization standard, because the focus is, as this Court recognized in Frederick, is focused on the child and whether the child has acclimatized to its surroundings. In the case of an infant, it cannot do so absent the shared intent of the parents. But Tesson is talking about six-year-olds, so why would Tesson... I mean, I know you can pluck language out of Tesson and then try to apply that to an infant, but Tesson wasn't even talking about an infant. Correct, Your Honor, and Tesson expressly recognized that the parent's subjective intent would be the only thing that this Court could look to in And this Court reiterated that in both Simcoxon and Pantelaris. Has any case ever said that an infant doesn't have a habitual residence? Yes, Your Honor. Which ones do you rely upon for that? We rely upon Delvoy v. Lee, Ovalle v. Perez, and Kachowska v. Haynes, and I believe, oh, In re, ALC. All right, thank you. The one point that I would like to mention is that we believe that reversing and rendering judgment in this case is the appropriate course of action because, as this Court recognized in Tesson, where it announced the acclimatization standard, it decided the case in the first instance on appeal without remanding for application of the standard because of the Hague Convention's Command B that these cases be resolved expeditiously. And we also seek a re-return order, which this Court has the clear inherent power to issue under the Supreme Court's case of Chafin v. Chafin. So my understanding is that both the child and the mother are now in Italy? Is that correct? Those facts are not in the record, Your Honor, but that understanding is correct. My understanding is that the child is with Taglieri, who is controlling access to AMT, and that my client does not possess the current facts as relating to Taglieri's treatment of AMT. And your other point, which you didn't have time to address, is the question about grave risk of harm? Yes, Your Honor. So the basic question that I would put to you is, after the Simcox case, which I think was the case involving the children and the father in Mexico, how can you say that this case involves a grave risk of harm? Because in this, Your Honor, under Simcox, the Court explained that a where there is credible evidence of sexual abuse or physical or psychological abuse or serious neglect. Here, there is credible evidence of physical and sexual abuse that the district court expressly credited as credible, even though it stated that the extent of the abuse was not clear. The court in Simcox similarly stated that the extent of the abuse was not clear in Simcox, and yet it held that there was a grave risk. Here there was also serious neglect of the child, including the fact that the father threatened to cut off the mother financially while she was during a difficult and dangerous pregnancy if she spent any more money on health related items, even though she nearly miscarried. He beat her over the head when she was nine months pregnant. He threatened the infant while the infant was in the hospital. He refused to allow her to change out of urine soaked clothing. And the other facts in the record that are set forth in our brief. Now, the district court legally erred by relying on the fact that there was no evidence that Taglieri ever physically abused the child, but it relied on Flynn versus Borders, a district court case decided before Simcox, in which this case expressly stated that there's no need for a child to first be traumatized before the Article 13B exception applies. And that in Simcox, the court found a grave risk as to the youngest child, which was not abused, and there was no evidence of any abuse as to that youngest child, yet there was a grave risk. Thank you. Thank you. Thank you, your honors. Excuse me, may it please the court. I'm John Sayer on behalf of Domenico Taglieri, along with Amy Hamilton. This is a simple case. Where he is here, a family has a home. One parent's removal of a child from that home without the consent of the other is wrongful, and the child must be returned. That is the fundamental principle of the Hague Convention on Civil Aspects of International Child Abduction, as recognized by this court in Friedrich versus Friedrich 24 years ago. So suppose that, hypothetically, that the child was born in Italy and was removed the next day, and that the mother had had that plan all along. Could you say that the habitual residence of the child was Italy? Yes, your honor. What would be your test that would say that? Is it just simply the place of birth? No, not simply the place of birth, although that is a risk in articulating some standard, but I think that the commentators agree, and the appellant seems to acknowledge that for infants and children of tender years, who cannot establish, quote unquote, acclimatization, it is the habitual residence of their parents. Well, so are you defining habitual residence then on the basis of the physical residence of the mother? Because in my hypothetical, the mother intended always to leave as soon as she got out of the hospital, but did deliver in Italy. So her intent, in my hypo, is not to stay in Italy, and not to have Italy be her habitual residence. I'm trying to respond to the application of intent, and would reject any application of intent in favor of a test that is strictly based on historical data. Looking backwards, as this court has indicated several times to the parents' practice in a certain location, as a Clevelander, I might want to live in Los Angeles, and might want to move to Los Angeles, but until I move, Cleveland's my home. Here, Italy was the place that the parties intended to live, agreed to live. They both had jobs there, they paid taxes there, they were established in the social structures of Italy. Their child was born there, for all intents and purposes, Italy was their home. So while one parent may intend to leave at some future point, that intent does not affect the habitual residence of the child. And as the convention indicates, and as other courts have indicated, there must be an habitual residence. What case says there must be an habitual residence? I believe it's Friedrich I. There must be an habitual residence. And that's the basis of the convention. The convention recognizes that the protection of custodial rights is at the core of its provisions. It can hardly be said that a child is born to a parent, or is born without custodial rights being vested somewhere, in some location. But I thought custodial rights is the second stage of this test, that the first stage is where is habitual residence? And then if the person, the parent, asserting wrongful removal establishes habitual residence, then that person also has to establish custody rights. I think that in terms of the purpose of the convention, it's clear that it is founded on the principle of protecting custodial rights. And those rights arise, as far as children are concerned, at the moment of birth. It would be a different case if the mother had removed the child prior to birth. Well, but don't both parents have custodial rights at the time of birth? That's true. That's absolutely true. So isn't the purpose more to prevent child abduction? It's not trying to protect the custodial rights of either parent. It's trying to prevent the abduction. That's true. As Perez-Vera says in her commentary, that there may be a distinction without a difference in that respect. Whether it is intended mostly to prevent the abduction or to protect the rights, the end result is the same. Well, suppose hypothetically that the mother has been told by the doctors not to travel, and therefore stays in Italy simply to deliver the child. And then because of the destruction of the marriage, because of the two not getting along, the mother immediately moves to the US. Would the habitual residence of the child under those circumstances, where it's due to the difficult pregnancy, be Italy? I would have to say, Your Honor, it depends on the prior events in the mother's life. If, as in the case of, say, Lee versus Delvoye, there was a transient nature to the mother's presence in Italy, and you're hypothetical, then under those circumstances, I think that there would be a different analysis. And in this regard, I think it is absolutely essential to note that the cases which discuss shared parental intent are all wrongful retention cases. There is a distinction between a wrongful retention case and a wrongful removal case. And in wrongful removal cases, it is the historical record, the past events that determine habitual residence. In a wrongful retention case, where a child has moved between homes in one or more countries over a period of time, it is often very difficult to establish a clear record and to weigh those competing balances or competing interests to come up with in habitual residence. And in that respect, all of the cases that discuss shared parental intent, and that includes Roberts versus Tesson, Jenkins, Jenkins, and Pantelaris, they're all wrongful retention cases, as is Fetter versus Evans-Fetter. The origin of the shared parental intent and acclimatization comes from wrongful retention, not wrongful removal. So are you saying that shared intent isn't the standard or even any part of the standard here? Yes, Your Honor, that would be my conclusion, especially with respect to infants, where the only way of coming up with an habitual residence is to determine what the habitual residence of the parents is. There's no requirement. But then all of the things that you were telling us about having jobs and social and all of that, you're not relying on that being shared intent, in the sense that I would have thought that would be one of your good arguments on that side, that what you really have here is arguably strong shared intent going in that then erodes and erodes. And the question is, when, if ever, do you lose that, as in Judge Moore's original hypothetical? Yes, I think that there is a nuance, if you will, that has to be addressed. And it is that shared parental intent does not mean parental agreement. For instance, in most divorce cases, many, many divorce cases, one of the parties may intend to return to a homestead out of state. But that intention will occur only after the divorce is finalized in the residence of the parties. Until the move occurs, the residence remains in the location where the parties are living. Now, to say that that is a shared intent implies that there is some form of agreement, when in fact it is simply a coincidence, if you will, that both parties, both parents, intend to stay in one location for some period of time. That is the subtle purpose. We have the case Robert versus Tesson, which is a Sixth Circuit published case from 2007. And it has a footnote saying that we recognize a very young child may lack cognizance of their surroundings sufficient to be acclimatized. We therefore express no opinion on whether the habitual residence of a child who lacks cognizance of his surroundings should be determined by considering the subjective intentions of his or her parents. Is there any Sixth Circuit case subsequent to Robert which addresses the very young child situation that we have here? In other words, is there a more specific test that we have adopted? Not that I'm aware, Your Honor. Okay, so we really have to figure out what should be the test for a very young child who can't be acclimatized because in two months no child knows what her circumstances are. Well, yes, to the extent that a young child is involved, it would seem to me, as I said, that the only way of approaching that analysis without venturing into the abyss of shared parental intent, subjective intent, is to look at the habitual residence of the child's parents as it has existed for some period of time. And there, as the Court is well aware, there's ample evidence in the record that the parties intended to live in Italy, were resident in Italy. That was their established residence. And there's no reason that the marital dispute. Well, I thought there was ample evidence that the mother was upset about the marriage, in particular about being hit by the father, and was upset by a number of other things, including the failure of the father to take her to the hospital to deliver the baby. And the treatment of, and I can go on and on, but I'm going to stop just, but there are six or seven different things that made the mother upset. So to say that Italy is the habitual residence when the mother asserts and has evidence that she's intending to go back to the U.S. as soon as she can seems problematic to me. Well, I can only reiterate that you may intend, I may intend to move to Los Angeles, but until I move, I'm a Clevelander. And Italy was where the mother had her job, where she intended to return to her job, where she had sought an au pair. All of the evidence, all of the objective indicia of habitual residence that Judge Oliver articulated in his opinion, bear upon this issue. There can be an intent to move, there can be an unhappiness, but that does not necessarily affect habitual residence. Habitual residence is a fact of termination. One of the perplexing things I think here when we're talking about intent is sometimes we look at the intent, some of these cases seem to suggest we look at the intent of individual parents. Other times it's phrased in terms of shared intent. So assuming that intent is a criteria, is it a shared intent? In other words, do they have to agree or is it determined by simply one or the other? I would say that it is not an agreement, but it is a, call it a confluence of intent. And even before that, Your Honor, I resist getting into the issue of intent with respect to habitual residence. Because you're really looking at more physical things. Where does somebody live? Correct. Correct. And the record here is that there is well-established in habitual residence. They were residents of Italy. So suppose, hypothetically, the mother realizes the marriage is deteriorating and moves to the U.S. and delivers the child the next day in the U.S. Would there, the habitual residence of the child be the U.S.? Well, that's not our case. I know. That's a hypo. It would seem to me that there would be still the argument that Italy was the habitual residence. If the mother left without the father's consent in order to deliver a child in the United States, the historical record should show clearly that the mother was resident in Italy. Even in my hypo where she was a U.S. citizen and had grown up in the U.S. and had lived and worked in the U.S. and gone to college in the U.S. and had only lived in Italy for 20 months? Yes. Wouldn't the problem be that you'd have to look at, in this case, the Italian law to see if Italian law granted custodial rights to the husband under a circumstance like that where the baby's born in the United States? I think that would be part of the analysis, yes. And if Italian law didn't grant him that rights, then? There would be no custodial rights. But that's the second step, not the habitual residence. That's correct. Now, if we could move on briefly to the grave risk of physical or psychological harm. Your opponent's arguing that the district court erred in that step. Why is your opponent wrong? I think there are three reasons that they're wrong. The first and most obvious is that the grave risk of harm needs to be directed towards the child. Yes. And whatever happened between Tagliari and Manaski had nothing whatever to do with the child. The record contains really only three instances of any indication of abuse. Number one, the slapping incident which Tagliari acknowledged that occurred in early 2014, I believe. That's while the mom is pregnant. Before mom is pregnant, I believe. Before the mom is pregnant. Right. I thought there was a slapping incident while the mom was pregnant. Well, there was an incident that supposedly occurred on February 10 in which she says that he furiously rolled over in the bed and hit me on the head. And then another time indicates that he got on top of me and hit me on the head. That was the second incident that occurred. And in cases of grave harm, it is always a matter of degree. If Judge Oliver found her testimony credible after four days of trial, it's difficult to dispute that. But at the same time, it is not a sufficiently grave risk proved by clear and convincing evidence. So I thought there were other things that were concerning regarding the treatment of the child if we assume that that's all we look at which is a question. One of which was the statement when the baby was crying in the hospital about shoving formula up her rear end. And another of which was not allowing the mom to change the clothing which were soaked in urine because of the expense of laundry when the dad is an anesthesiologist. Which seems to show, both of those seem to show a lack of care for the baby which is of great concern. I'm looking, Your Honor. There was one incident, or one bit of testimony, and I'm afraid my post-it note fell out. But as far as shoving formula up the baby's ass, I believe that the testimony from Manaske actually was that she thought that's what he was going to do. Not that's what- Not that he said that he was going to do that. Right. Okay. Her anticipation that that might occur. And as far as changing the baby's diaper is concerned, I think Frederick, too, was quite insightful when it said, trying to parse disputes, marital disputes, is a dangerous venture. Who knows what it means if the father said, you know, let her go. Is it that abusive for an infant to say, you know, don't change your diaper just yet? Is it a grave risk of harm? I think that the matter of degree is manifest. Counsel, I thought when you began your answer to Judge Moore's question of why isn't there a grave risk, you said there are three reasons. Yes. One was we focus on the child, not the mother. Right. And I thought we digressed at that point. Did you have- Yeah, I'm sorry. I'm sorry. Yeah, well, the second reason is that it is a matter of degree and intent. And the third reason is that the difficulty with this area, as recognized in Frederick, too, is that it gets perilously close to a decision on custody, which is not the province of the Hague Convention. It may be. It may be. Okay, if that's your third point, I just wanted to get my list. Fine. But I think that that's why there was no grave risk of harm and why Judge Oliver's decision was correct and should be affirmed here. Thank you. A couple of quick points. First, Simcox expressly refutes the proposition that there must be abuse of the child before finding the Article 13b exception applies. And in that case, the court in fact found a grave risk as to the youngest child towards whom there was no abuse. And in Simcox, the court recognized that the purposes of the convention would not be served by returning a child to abusive situation, whether the abuse was direct or indirect. But the problem in Simcox, as I recall, was that the district judge was instructed to figure out whether there could be adequate protections of the child. That was another issue in the case, the undertakings, Your Honor, but this court expressly found that there was a grave risk in Simcox. But why couldn't there be similar undertakings here? Here, undertakings would not be appropriate, as the court recognized in Simcox, for a couple of reasons. First, because this case involves abuse, the undertakings are less appropriate. But also, undertakings are appropriate in cases before the return has occurred as a condition of return. But here, the return has already occurred. Another point, Taglieri attempts to distinguish removal and retention cases. But he points to no case indicating that the standard for determining a child's The only difference is that in retention cases, the court has to determine the date on which the retention began for statute of limitations purposes. And in fact, in both Ovalle versus Perez and in Kujawska versus Haynes, the courts analyzed the removal of the children after two months by the respondent in that case, not retention but the removal, and found that there was no habitual residence at all because the parents did not share an intent to raise the child there. Kujawska is similarly on point because there, the mother had lived there for a few years before the birth occurred. The mother then- She's the one who was the illegal alien at the time. That's correct, Your Honor. But she was living in the United States for several years before the birth, and it was only after she realized that the father did not want to take care of the child that she returned with the child to Poland. And the court found that there was no habitual residence at that time. What would happen under your analysis if a child is born and at that point the marriage is seemingly acceptable, and these type of events that we've been talking about here that happened before the birth actually then happened after the birth. So the mother and the father at the time of the birth seem to agree, that's where they're going to raise the child, and then this abuse occurs. And at that point, while the child is still young, add into my hypothetical, two weeks old, that the mother then changes her intent as to where to raise the child and then leaves. Is there a habitual residence under that situation? Yes, Your Honor. It would be a closer case, and the court would have to determine that there was a shared intent up until that point after the birth. But under our test, that's correct. We believe that because there was never a shared intent while the child was alive, that is determinative. So the case that you're talking about is closer to Friedrich, where there was no indication that the parents lacked a shared intent until the precipitating event 19 months into the child's life. And under, in your analysis then, does it matter whether the shared intent changes then at the time of conception or somewhere during conception? Are we getting into those sorts of line drawings? No, Your Honor. It is, because it is habitual residence of the child, another necessary factor is that the child resides in that state at the time the shared intent also exists. So for example, in In Re ALC, the court expressly held that Sweden was not the child's habitual residence because the child, the mother was pregnant while she was in Sweden. The court also held that the child's habitual residence was not the United States because the parents lacked a shared intent when the child was born there. So just to be clear then, if hypothetically, the parents have a shared intent to live in Italy, and the child is born in Italy, and that shared intent remains for the first month, but then things deteriorate and the mother intends to leave and leaves as soon as a passport is given, you would say there was a habitual residence in Italy? We would say that that is a closer case, but yes, but that is, we stress that that is not this case. In this case, it was clear that there was no shared intent from before the child was born, and the district court made no shared intent finding whatsoever. So if we thought shared intent was a critical element of a newborn type of case, should we remand to the district court for a finding on whether there is shared, there was shared intent prior to the birth and during the first month? No, Your Honor. This court should determine that in the first instance as this court did in Robert versus Tesson, where the court, applying its new acclimatization standard, recognized that the Hague Convention commands this court to resolve petitions expeditiously. The court in that case resolved the case in the first instance on appeal and rendered judgment because there was a sufficiently developed record. Similarly here, there is a sufficiently developed record with four days of trial, dozens of exhibits and testimony in evidence. And this court should also issue a re-return order, which it has the inherent authority to do under chafin v. chafin, because AMT has spent most of her life in the United States here in Ohio with her mother and her extended family, and it would be inequitable for this court to refuse to grant a stay pending appeal, but then also refuse to grant a re-return order in the event of reversal. Thank you. Thank you. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?